UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                              CASE NO.

**RONDA WORTMANN D'ANNA**                           **12-12680**
                                                    SECTION A
DEBTOR(S)                                           CHAPTER 13

_____

**BRUCE L. FEINGERTS**                              ADVERSARY NO.

PLAINTIFF                                           **15-1018**

VERSUS

**RONDA WORTMANN D'ANNA, ET AL**

DEFENDANTS

_____

**BRUCE L. FEINGERTS**                              ADVERSARY NO.

PLAINTIFF                                           **15-1045**

VERSUS

**RONDA WORTMANN D'ANNA, ET AL**

DEFENDANTS

_____

## **MEMORANDUM OPINION**

On September 30, 2015, the following matters came before the Court:

1) Motion to Dismiss Party filed by Fidelity National Title Insurance Co. ("Fidelity");[1]

2) Motion to Strike Law and Legal Issues filed by Bruce Feingerts ("Feingerts");[2]

_____

[1] Case 15-1045, P-28.

[2] Case 15-1045, P-52.

3) Motion for Partial Summary Judgment filed by Ronda D'Anna;[3]

4) Trial on the merits in case 15-1045;

5) Trial on the merits in case 15-1018; and

6) Motion for Partial Summary Judgment filed by Feingerts.[4]

Following the trial, the parties requested and were allowed time to file post-trial briefs. After submission of briefs, the Court took the matters under advisement.

## I. Findings of Fact

The center of this dispute is a contested title to real estate located at 5839 Bellaire Dr., New Orleans, Louisiana ("Bellaire Property"). The Bellaire Property was purportedly purchased by Ronda Wortmann D'Anna ("Debtor" or "D'Anna") from Doris Lavner Feingerts ("Mrs. Feingerts") and the Maurice P. Feingerts Testamentary Trusts ("Trusts").

The Bellaire Property was originally part of the community of acquets and gains between Mrs. Feingerts and her husband, Maurice Feingerts. When Maurice died on July 19, 1967, his will ("Will"), bequeathed his entire estate to his three (3) children, Susan, Bruce, and Jane, in trust but subject to a usufruct in favor of Mrs. Feingerts.[5] The Trusts created by the Will would hold the property of his estate until each child reached the age of thirty-one (31).

---

[3] Case 15-1045, P-29.

[4] Case 15-1018, P-4.

[5] The Will, dated February 18, 1966, identified his three (3) children and stated their ages. At the time of its execution, Susan was 17; Bruce 14; and Jane 10. In this Opinion, Bruce Feingerts is referred to as "Feingerts," Susan Feingerts is now Susan Feingerts Hackmeier or "Hackmeier," and Jane Feingerts is now Jane Feingerts Rushing or "Rushing."

2

A Judgment of Possession was rendered on September 19, 1974, naming Mrs. Feingerts as trustee of the children's testamentary trusts.[6]  It also recognized Mrs. Feingerts as owner of half of the community existing between herself and Maurice along with a usufruct over the other half.  The Trusts  were recognized as one-third owners of Maurice's half of the community and separate property subject to the usufruct.  Thus, the children, as beneficiaries of the Trusts, would ultimately inherit the naked ownership of a one-sixth (1/6) interest in the Bellaire Property.

Mrs. Feingerts listed the Bellaire Property for sale and on April 16, 2009, entered into an agreement to sell it to D'Anna.[7]  Feingerts was aware that his mother had listed the Bellaire Property for sale, but did not consent to either its listing or sale.

Crescent Title, LLC ("Crescent") and Robert Bergeron were hired to close the sale.  In the course and scope of this representation, Paul M. Lapeyre ("Lapeyre"), an attorney with Crescent, researched the Bellaire Property's title.  In connection with his inquiry, Lapeyre found an Orleans Parish property tax bill that listed the property owner as "FEINGERTS DORIS L ETALS," the Will, the Judgment of Possession, a release of Mrs. Feingerts as tutor for Rushing, and a cancellation of a "Minor's Mortgage" that had been executed by Rushing in favor of Mrs. Feingerts.  These documents  were  attached to a Title Commitment Authorization ("Title Commitment") issued in favor of D'Anna.[8]  Following the closing, Fidelity issued a Homeowner's Policy of Title Insurance to D'Anna ("Title Policy").[9]

---

[6] Exh. 1.

[7] Exh. 9.

[8] Exh. 1.

[9] Exh. 5.

3

The Will gave Mrs. Feingerts, as trustee, the "[P]ower to buy and sell and convey property for and on behalf of the trust..." However, by the time Mrs. Feingerts listed and agreed to sell the Bellaire Property, all three (3) Feingerts children had reached the age of thirty-one (31). Nevertheless, on July 30, 2009, Mrs. Feingerts, individually and as trustee of the Trusts, transferred the Bellaire Property to D'Anna by Cash Sale for the purchase price of $127,000 ("Sale").[10]

D'Anna financed the purchase with a loan from Gulf Coast Bank and Trust Company ("Gulf Coast"). The loan is represented by a a promissory note dated July 30, 2009, executed by D'Anna in favor of Gulf Coast ("Note") and secured by a mortgage encumbering the Bellaire Property ("Mortgage").[11] Subsequent to the Sale, Gulf Coast transferred the Note and Mortgage to Bank of America, N.A ("BOA"). D'Anna stopped making payments on the Note in February 2014. BOA maintains that it was due $156,439.03 as of October 28, 2015.[12]

Mrs. Feingerts died in December 2011. A Succession was opened ("Succession"), and Rushing was appointed her succession representative.

On July 30, 2012, Feingerts filed a Petition for Recognition as Owner of Immovable Property against D'Anna in Civil District Court for the Parish of Orleans ("State Case").[13] Feingerts alleges that he inherited a one-sixth (1/6) interest in the Bellaire Property from his father, and his mother attempted to sell it to D'Anna without his consent or authority. Feingerts' siblings, Rushing and Hackmeier, have not challenged the Sale by their mother to D'Anna.

---

[10] Exh. 3.

[11] Case 12-12680, P-50.

[12] Case 15-1045, P-69.

[13] Case no. 12-7423, Parish of Orleans.

4

In response, D'Anna filed third party demands against the Trusts and the Succession.   The Succession filed third party demands against Fidelity and Crescent, but it later dismissed its Complaint against Fidelity.

Hackmeier and Rushing were joined as defendants to the State Case.   D'Anna filed cross-claims against Hackmeier and Rushing.  Jacques P. Bezou, Stacy R. Palowsky, and the Bezou Law Firm, previous counsel to Feingerts, also intervened in the State Case alleging an attorney's lien over any recovery by Feingerts for unpaid legal fees.

On September 10, 2012, D'Anna filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code.[14]

On April 5, 2013, Feingerts filed a Motion to Traverse the Estimative and Descriptive List of Assets and Liabilities in the Succession.[15]  The State Court entered a Judgment on October 25, 2013, finding no error with the descriptive list.[16]  Feingerts appealed this ruling to the Louisiana Fourth Circuit Court of Appeal which affirmed in favor of the Succession.[17]  Feingerts' Application for Writ of *Certiorari* to the Louisiana Supreme Court was denied.

On March 2, 2015, Feingerts filed an adversary proceeding against D'Anna which was assigned case number 15-1018.  The Adversary Complaint alleged and restated the facts and relief requested in the State Case.  With her Answer, D'Anna filed a third party demand against Fidelity.[18]

---

[14] Case 12-12680.

[15] Exh. 11.

[16] Exh. 13.

[17] Exh. 54.

[18] Case 15-1018, P-3.

On March 10, 2015, D'Anna removed the State Case to the United States District Court for the Eastern District of Louisiana. The District Court referred the case to the Bankruptcy Court, and it was assigned adversary number 15-1045.

On September 29, 2015, this Court approved a settlement among D'Anna, Rushing, and Hackmeier which included the execution of quitclaim deeds transferring any interests that Rushing or Hackmeier had in the Bellaire Property to D'Anna as well as ratification of the Sale.[19]

Feingerts contends that he is a one-sixth (1/6) owner of the Bellaire Property. D'Anna claims that Mrs. Feingerts had authority to sell the Bellaire Property to her, and thus, she is its full owner. Mrs. Feingerts' Succession, Fidelity, and Crescent concur. In the alternative, and in the event that the Court finds Feingerts to be a one-sixth (1/6) owner of the Bellaire Property, D'Anna asserts that Mrs. Feingerts breached the warranty of eviction and seeks damages against the Succession and reimbursement under the Title Policy with Fidelity.

## II. Jurisdiction

Once a bankruptcy is filed, the federal courts, specifically the bankruptcy court, obtain jurisdiction over any claims against the debtor or property of the estate.[20] Claims by nondebtors against nondebtor parties are generally outside of the federal jurisdiction created by 28 U.S.C. §§ 157 and 1334, but under 28 U.S.C. § 1334, a federal court, including a bankruptcy court, may assert federal jurisdiction over any claims that "arise in" or are "related to" a bankruptcy.[21]

---

[19] Case no. 12-12680, P-107.

[20] 28 U.S.C. § 157.

[21] *Executive Benefits Insurance Agency v. Arkison*, 134 S.Ct. 2165 (2015); *Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011); *Pacor v. Higgins*, 743 F.2d 984 (3rd Cir. 1994).

6

"Related to" jurisdiction turns on whether the outcome of a proceeding could conceivably have an effect on a debtor's estate.[22]   Although this characterization of jurisdiction appears boundless, in truth a bankruptcy court's jurisdiction, while broad, is not limitless.[23]   In analyzing "related to" jurisdiction, courts must be careful not to expand the whole in a universe where every action or claim is related to every other.

This Court has jurisdiction over any claims against D'Anna. This includes Feingerts' claim challenging her ownership of the Bellaire Property.[24]   As to the claim by D'Anna against Fidelity, Crescent, and the Succession (collectively "Defendants"), Defendants have affirmatively consented to the jurisdiction of this Court.  Because the claims by D'Anna against each of the foregoing are both property of the estate and related to the bankruptcy case, the Court can and will exercise jurisdiction over them.  As to the claims presented by Feingerts, the Succession, Fidelity, Bergeron, Crescent, or Bank of America  against each other, the Court lacks jurisdiction or constitutional

---

[22]   *Pacor v. Higgins*, 743 F.2d 984, 994 (3rd Cir. 1994).

[23]   *Northen Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 US 50, 102 S.Ct 2858, 73 L.Ed.2d 598 (1982); *Celotex Corp. v. Edwards,* 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995); *Stern v. Marshall*, 131 S.Ct.2594, 180 L.Ed.2d 475 (2011).

[24]   When determining bankruptcy jurisdiction, "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern v. Marshall*, 131 S.Ct. 2594, 2628, 180 L.Ed.2d 475 (2011).  Feingerts filed proofs of claim 19 and 20 in D'Anna's bankruptcy case asserting title to the Bellaire Property as the basis for his claims.  Adversaries 15-1018 and 15-1045 are an adjudication of those claims. Bankruptcy courts have jurisdiction over the determination of whether property belongs to the estate. *Wellness International Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 191 L.Ed.2d 911 (2015); *In re Oxley Development Co., LLC*, 493 B.R. 275 (Bankr.N.D.Ga. 2013); *In re Endeavor Highrise, L.P.*, 432 B.R. 583 (Bankr.S.D.Tex. 2010).

authority.[25] As a result, their issues have not been considered but, instead, are preserved by the parties for later determination by a court of competent jurisdiction.

## III. Conclusions of Law

### A. Summary Judgment Standard

Cross Motions for Summary Judgment came before the Court along with trial on the merits of the Complaints.  Summary Judgment is proper when no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.[26]  In considering a motion for summary judgment, the court must view the evidence introduced and all factual inferences in a light most favorable to the party opposing summary judgment.[27]  The movant bears the burden of proving "absence of genuine issue of material fact."[28] "An issue is material if its resolution could affect the outcome of the action."[29]

A party moving for summary judgment must rely on evidence in the record and affidavits supported by personal knowledge.[30] Because this Court went beyond the affidavits, considering the evidence submitted into the record to make its rulings, the Court will rule on the merits rather than summary judgment.

---

[25] *Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

[26] *Hassan v. Lubbock Independent School District*, 55 F.3d 1075, 1079 (5th Cir. 1995); F.R.C.P. 56(c); F.R.B.P. 7056(c).

[27] *Hightower v. Texas Hospital Ass'n,* 65 F.3d 443, 447 (5th Cir. 1995).

[28] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).

[29] *Weeks Marine, Inc. v. Fireman's Fund Insurance Co.*, 340 F.3d 233, 235 (5th Cir. 2003).

[30] F.R.C.P. 56(c).

8

### B. Feingerts Owns a One-Sixth Interest in the Bellaire Property

Feingerts neither agreed to the listing, signed a power of attorney, nor signed the Sale documents for the Bellaire Property. Despite Feingerts' lack of agreement, Crescent, relying on Lapeyre's Title Commitment, warranted title and closed the Sale, and Fidelity issued a Title Policy.

Lapeyre's Title Commitment relied on the Judgment of Possession which designated Mrs. Feingerts as trustee of the Trusts and authorized her "in her capacity as Trustee of the Testamentary Trusts ... to sell trust property without advertisement or appraisement."[31]

Defendants contend that they were entitled to rely on the Judgment of Possession. They further allege that they justifiably relied on Mrs. Feingerts' authority as trustee of the Trusts because there was nothing in the public record to place a third party on notice of the Trusts' termination. In support of this position, Defendants cite to La. R.S. 9:2029.1, which protects third parties when dealing with a trustee in just this circumstance. Feingerts argues that Defendants were not entitled to rely on the absence of a notice of trust termination because under Louisiana law, none was required. Rather, La. R.S. 9:2029.1 became effective after the Sale, on August 1, 2015, and cannot be retroactively applied.

#### 1. The Public Records Doctrine

On the death of Maurice Feingerts, the Trusts were created.[32] Upon execution of the Judgment of Possession in the Maurice Feingerts succession, each Trust was given a one-sixth (1/6) interest in the Bellaire Property. The Judgment of Possession recognizing this transfer was recorded in the records of Orleans Parish placing all on notice of the Trusts' existence.

---

[31] Exh. 1, p. 10.

[32] "A testamentary trust is created at the moment of the settlor's death." La. R.S. 9:1821.

9

As of February 1987 (and perhaps earlier), the Maurice P. Feingerts Testamentary Trust for the benefit of Bruce L. Feingerts terminated. Nothing in the Judgment of Possession indicated when the Trusts would terminate; instead, only the Will provided notice of their termination date. However, under Louisiana law, Feingerts was immediately the owner of the property formerly held in trust without restriction. "A termination of a trust causes the dispositive provisions of the trust to achieve their ultimate effect."[33] Thus, Feingerts owned a one-sixth (1/6) interest in the Bellaire Property from 1987 forward.

Despite this fact, Defendants argue that they were entitled to rely on Mrs. Feingerts' authority to sell because the Judgment of Possession did not indicate when the Trusts would terminate. Defendants claim that under the public records doctrine, Louisiana law recognizes the right of a trustee to alienate property held in trust even after the termination of the trust itself.

Louisiana law generally requires that proof of an interest in immovable property be in writing and recorded to be effective against third persons. For example, La. R.S. 6:830 requires the recordation of an act of mortgage in order to affect third parties.[34] The same can be said for a lease, sale, counterletter, or donation of immovable property.[35] Judgment liens against immovable property also must be recorded to affect third parties acquiring an interest.[36] Building on these requirements, the public records doctrine has developed.

---

[33] La. C.C. 9:2029.

[34] *See also* La. C.C. Art. 3338.

[35] *See* La. C.C. Art. 1839, 2028, 2035, 2442, and 3338.

[36] *See* La. C.C. Art. 3300.

In 1909, the Louisiana Supreme Court articulated the public records doctrine in the case of *McDuffie v. Walker.*[37]  *McDuffie* confirmed that a third person can acquire valid title from the owner of record, even when the record owner is not the true owner, provided the act of sale to the true owner is not of record.  In *McDuffie*, certainty of the public record overcame even the dictate of the Louisiana Civil Code which unambiguously stated, "the sale of a thing belonging to another is null."[38]

Later, the Court in *Judice-Henry-May Agency, Inc. v. Franklin*[39]  explained:

Louisiana public recordation law is both codal and statutory.  Louisiana Civil Code Article  2266 provides in pertinent part that:

> "All  sales, contracts and judgments affecting immovable property, which shall not be so recorded, shall be utterly null and void, except between the parties thereto."

Revised statute 9:2721 lists more completely the acts which must be recorded to be valid against a third party:

> "No sale, contract, counterletter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated; and neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties." [40]

---

[37] *McDuffie v. Walker,* 125 La. 152, 51 So. 100 (La.1909).

[38]  *Camel v. Waller*, 526 So.2d 1086, 1090 (La. 1988) (citing *McDuffie* and La. C.C. Art. 2452).  The current version of La. C.C. Art. 2452 provides, "The sale of a thing belonging to another does not convey ownership."

[39] *Judice-Henry-May Agency, Inc. v. Franklin*, 376 So.2d 991 (La. App. 1 Cir. 1979).

[40]  *Judice,* 376 So.2d at 992.  In 1985, La. C.C. Art. 2251-2267 were subsequently repealed and replaced by La. R.S. 9:2741-2757.  La. R.S. 9:2721 has been substantially amended to only address sales, attachments, and leases of immovable property. Transfers of immovable

In summary, while many acts between the parties are enforceable if not recorded, they do not bind

third parties.   Conversely, while the public records doctrine protects a third person against

unrecorded acts, it does not protect the third party against all unrecorded interests.

Fundamentally, the doctrine relies on the requirements contained in various code and

statutory provisions for recordation.  As set forth above, most transfers of an interest in immovable

property require the recordation of a written  instrument.  The public records doctrine provides that

in the absence of such a document, the third party who acquires rights in the immovable takes those

rights free from the unrecorded interest.[41]  However, in the absence of a requirement to record, the

doctrine has no application.  *Camel v. Waller,*[42] a decision cited by Defendants, is illustrative.

In *Camel*, the plaintiff, Mrs. Camel, sued a purchaser of immovable property that formally

belonged to the community of acquets and gains between  herself and her ex-spouse.  Her former

husband purchased the property during their marriage, but in the act of purchase, he  recited his

marital status as legally separated when in fact this was not true.  Subsequently, the Camels were

---

property are now addressed by La. C.C. Art. 1839, 2442, and 3338.  Contracts involving
immovable property are addressed by La. C.C. Art. 2035.   Judgment liens are addressed by La.
C.C. Art. 3300.   Counterletters involving immovable property are addressed by La. C.C. Art.
2028.  Mineral rights are addressed in La. R.S. 31:18. Mortgages are addressed in La. R.S. 6:830
and La. C.C. Art. 3338.

[41]  *Harang v. Plattsmier*, 21 La. Ann. 426 (La. 1869) (third mortgage outranked two
earlier unrecorded mortgages even though the third mortgage referred to the other two); *Sklar
Producing Co. v. Rushing*, 262 So.2d 115 (La.App. 2 Cir. 1972) (unrecorded letter agreement
referred to in a recorded assignment had no effect on third parties); *Roemer v. Caplis*, 369 So.2d
1186 (La. App. 2 Cir.1979) (unrecorded partition agreement referred to in a conveyance had no
effect on a third person); *Baird v. Atlas Oil Co.*, 84 So. 366 (La. 1920) (unrecorded mineral lease
is ineffective as to a subsequent lessee); *Cole v. Richmond*, 100 So. 419 (La. 1924) (innocent
third persons purchasing upon the faith of the public records are not bound by any knowledge
except as disclosed by those records).

[42]  *Camel v. Waller*, 526 So.2d 1086 (La. 1988).

12

legally separated, after which Mr. Camel sold the property to a third party, this time correctly reciting his marital status as legally separated. The judgment of separation was not of record when the sale occurred.

Mrs. Camel sued the purchasers alleging her ownership interest in the properties. The defendants argued that because the judgment of separation was not of record, they had no reason to question the separate status of the property and were entitled to rely on the public records.

The Supreme Court began its analysis by recognizing the conflict between the public records doctrine and longstanding legal principles favoring rights in community property. In harmonizing the competing principles, the *Camel* Court held that under the public records doctrine, a purchaser may not rely on the truth or validity of assertions contained in a recorded document.

> [The public records doctrine] does not "create rights in a positive sense, but rather has the negative effect of denying the effectiveness of certain rights unless they are recorded." *Phillips v Parker*, 483 So.2d 972 (La. 1986). Also, as Judge Redmann has so aptly pointed out, it is an essentially negative doctrine. Third persons are not allowed to rely on what is contained in the public records but can instead "rely...on the *absence* from the public record of those interests that are required to be recorded." Redmann, The Louisiana Law of Recordation: Some Principles and Some Problems, 39 Tul.L.Rev. 491 (1965). Thus, a third party is not protected by reliance on a recitation of marital status in the public records...[43]

The public records doctrine also "[d]oes not create a presumption that the instrument is valid or genuine."[44] Thus, the purchasers could not rely on Mr. Camel's assertion of his marital status when defending against the ownership interests of Mrs. Camel.[45]

---

[43] *Camel, supra* at 1089-90 (emphasis in original). *See also Evans v. City of Baton Rouge*, 68 So.3d 576, 580, 2010-1364 (La.App. 1 Cir. 2/14/11).

[44] La. C.C. Art. 3341(1).

[45] Although the purchasers could not rely on Mr. Camel's recitation of separate status, in fact they still prevailed. The transfers in question occurred prior to 1980. Under the law then in

La. C.C. Art. 3339 codified the *Camel* decision. It states:

A matter of capacity or authority, the occurrence of a suspensive or resolutory condition, the exercise of an option or right of first refusal, a tacit acceptance, a termination of rights that depends upon the occurrence of a condition, and a similar matter pertaining to rights and obligations evidenced by a recorded instrument are effective as to a third person although not evidenced of record.

The Civil Code also provides in Art. 3341(2), "The recordation of an instrument ... [d]oes not create a presumption as to the capacity or status of the parties."

The jurisprudence, La. R.S. 9:2741-2757, and La. C.C. Art 3339, explain that the public records doctrine only protects third parties against unrecorded interests which by law must be recorded. Rights not established by written document or judgment, such as those created by operation of law or which go to capacity or authority, are unaffected by the doctrine. Common examples include rights created under community property law, legal usufructs, and legal and apparent servitudes.

Similar results occur when oilfield, public, or private works act liens are involved. For example, pursuant to La. R.S. 9:4862, certain persons acquire a lien or privilege over a mineral leasehold when the claimant begins rendering services at, goods are delivered to, movables or persons are transported to or from, or property leased by the claimant is placed upon the well site. Although unrecorded, the privilege primes any later recorded interest in the leasehold. It only ceases to have effect as to third parties if 180 days after the cessation of all activity giving rise to the privilege, the claimant fails to file a statement of privilege in the public record, or after filing the

---

effect, Mr. Camel had the unrestricted authority to alienate community property as head and master. As a result, Mrs. Camel's attempts to avoid the transfer of her interests in the community asset were denied. Nevertheless, the Court recognized that the result would be different if the transfers had occurred later.

statement, fails to institute suit within one year.[46]  Thus, the inchoate and unrecorded rights of the

oilfield claimant may indeed outrank those of a subsequently recorded interest in the immovable

property.  The same result may occur with privileges created under the public or private works acts.[47]

Privileges against immovable property granted under the Civil Code may also be enforced against

subsequently acquired rights because they do not have to be recorded to affect third parties.[48]

What these examples illustrate is that most, but not all, interests in immovable property must

be recorded in order to affect the rights of third parties.  When a recorded act is required, the public

records doctrine protects those who acquire an interest in the property if no act is of record.  The

*absence* of the document is sufficient even when actual knowledge of another's claim may exist.

However, if the existence of a claim does not require a recorded act, the public records doctrine does

not protect the third party from that interest because its absence from the public record is of no

comfort.  What then about property acquired by virtue of the termination of a trust?

### 2.   Is a Recorded Notice of Trust Termination Necessary To Affect Third Parties?

To establish a testamentary trust, a written document executed in a form complying with the

requirements to effect a donation *mortis causa* must be used.[49]  Although created through a will, a

testamentary trust does not spring to life until the testator dies, but from the moment of death, it

---

[46]  La. R.S. 9:4865.

[47]  *See* La. R.S. 9:4821 and  38:2242.1.

[48]  *See* La. C.C. Art. 3186, 3249, and 3250.  A privilege on an immovable acquired prior
to the acquisition of a mortgage on immovable property primes that interest though the existence
of the privilege is not of record. *See Conservative Homestead Ass'n v. Boyle*, 135 So. 663 (La.
1931); *C & J Contractors v. American Bank & Trust Co.*, 559 So.2d 810 (La.App.1 Cir. 1990).

[49]  The requirements for donations *mortis causa* are set forth in La. R.S. 9:1751.

exists.[50]  When the term of a trust expires, the beneficiary is immediately freed from the restraints

of the trust.[51]   Nothing further need be done for the property held in trust to be freed of its

restrictions; the beneficiary becomes the owner by operation of law.[52]

Defendants argue that a beneficiary's rights of ownership may nonetheless be ignored if the

trustee sells the property without notice on the public record of the trust's termination. In this case,

the capacity and authority of Mrs. Feingerts is in question.   Despite the recorded Judgment of

Possession, as *Camel* and the Civil Code direct, Defendants were not entitled to rely on either her

authority or capacity as trustee to execute the Sale.[53]

In addition, prior to August 1, 2015, there were no statutes or Code articles requiring the

recordation of an act of termination of a trust in order for the beneficiaries to protect themselves

against third party claims. In contrast, La. C.C. Art. 3339 provides that when immovable property

---

[50]   La. R.S. 9:1821.

[51]   La. R.S. 9:2029.

[52]  This is distinguishable from property acquired through a donation *mortis causa* or by inheritance.

[53]  D'Anna also cites La. R.S. 9:2092(B)(2) for the proposition that Mrs. Feingerts had authority to sell the Bellaire  Property.  Until August 1, 2015,  La. R.S. 9:2092(B)(2) provided:

> Unless the trust and abstract of trust recite or otherwise note any modification or restriction of the trustee's powers or duties, the trustee shall have all of the powers and duties granted to trustees under the Louisiana Trust Code.

No one has questioned Mrs. Feingerts' power to sell the Bellaire Property when she was the trustee (prior to the children reaching age thirty-one (31)).  Nevertheless, at the time of the Sale, the Trusts had terminated and her authority ceased.  La. R.S. 9:2092(B)(2) does not extend powers once held by a trustee beyond the existence of the trust.  It merely provides that in the absence of a recorded trust document specifying the authority of the trustee, third persons may rely on the powers granted by the Trust Code.  Of course, the Trust Code provides that a trustee's powers terminate when the trust terminates.

16

is acquired by operation of law, the occurrence of its acquisition need not be recorded to affect third parties.

Defendants cite to *Ruel v. Dalesandro*[54] as contrary authority to the above.  In *Ruel*, Sally Ruel established an *inter vivos* revocable trust with her children as beneficiaries and her son, James, as the trustee.  James transferred a piece of immovable property from the trust to Sally.  Thereafter, Sally transferred the property to Miles and a limited liability company owned by James.  The other beneficiaries of the trust sued Miles claiming an interest in the property.  Miles filed an exception of no cause of action which was denied by the district and appellate courts.  However, the Louisiana Supreme Court granted *writs* and overturned the lower court's decision, granting the exception of no cause of action.  The Court gave no reasons for its ruling.   All that is known is that the plaintiffs, the beneficiaries of a trust, sued a third party purchaser who acquired title from the trustee.  Why the sale was subject to dispute is a mystery.   Although the parties supplied memoranda and evidence from the record, none of the facts, arguments, or evidence submitted to this Court were recognized by the Supreme Court in its ruling.   As a result, this Court cannot determine why judgment was rendered and will not speculate as to its reasons.

Defendants also point to *Owen v. Owen*[55] as authority for their position.   In *Owen*, six siblings sued their seventh sibling attacking two (2) sales of immovable property by their father to him.  Following his purchases, the son sold the properties to third parties.  The other siblings also sued the third parties claiming that the sales from their father  were disguised donations.  The Court

---

[54]  *Ruel v. Dalesandro*, 152 So.3d 893 (La. 2014).

[55]  *Owen v. Owen*, 336 So.2d 782 (La. 1976).

found that the third party purchasers were entitled to rely on the face of the sales which declared them to be for validly received consideration.

*Owen* stands for the proposition that a vendor may rely on the delivery of the stated consideration in a recorded act of sale. It does not challenge or question the fundamental limitations of the public rights doctrine. Instead, it simply holds that a third party purchaser may rely on a recorded sale, and challenges to the sale based on the failure to deliver consideration, fraud, or simulation may not be alleged against him.

Finally, Defendants point to *Judice-Henry-May Agency, Inc v. Franklin.*[56] In *Judice*, the plaintiff leased immovable property from 610 Jefferson Corporation ("610"), the predecessor in title to the defendant, Franklin. The lease was not recorded. 610 assigned the lease to First City Mortgage Company of Dallas, Texas, who recorded the assignment.[57] 610 then sold the property to Smith *et al.* who resold the property to Franklin. In attempting to enforce its rights under the lease, Judice argued that Franklin had knowledge of its lease with 610 because of the recorded assignment. The *Judice* Court held, "Jurisprudence to the effect that unrecorded acts will have no legal effect on a third person, even where the third person has actual knowledge of the unrecorded acts, is of long standing."[58] Because the recordation of the lease was required in order to effect third parties, Franklin was under no obligation to find the unrecorded document, even if he suspected its existence.

---

[56] *Judice-Henry-May Agency, Inc v. Franklin*, 376 So.2d 991 (La. App. 1 Cir. 1979).

[57] Although the case is not completely clear, it appears that the assignment was to collateralize an obligation of the bank rather than a transfer of ownership.

[58] *Judice*, 376 So.2d at 992. *See also Brown v. Johnson*, 11 So.2d 713 (La. App. 2 Cir. 1942), *rehearing denied, cert. denied*; *Wells v. Joseph*, 101 So.2d 667 (La. 1958); *Pittsburgh Plate and Glass Company v. Woodcock*, 150 So.2d 660 (La. App. 3 Cir. 1963); *Wood v. Morvant*, 321 So.2d 914 (La. App. 1 Cir. 1975).

However, *Judice* involves the absence of a recorded lease, recordation of which is clearly required under Louisiana law if third party rights are to be affected.

In conclusion, Defendants have failed to establish that prior to August 1, 2015, Louisiana law required the recordation of a trust's termination.

### 3.   What Is the Effect of the Failure To Record the Will or an Extract?

La. R.S. 9:2092 provides that if a trust includes immovable property, the trustee must file either the trust instrument or an extract in the parish where the immovable property is located.  Mrs. Feingerts failed to record the trust instrument or extract but recorded the Judgment of Possession. Defendants contend that because Mrs. Feingerts failed to file the trust instrument or extract, under the public records doctrine, they could rely on Mrs. Feingerts' authority as trustee to transfer the Bellaire Property based on the Judgment of Possession.  Defendants' argument on this point is both inconsistent and a red herring.

La. R.S. 9:2092 protects third parties when dealing with the record owner of the property, i.e. the settlor or owner of the property prior to its inclusion in the trust.  In other words, the statute protects a third party who acquires from the record owner against the claims of a trustee or beneficiary unless the trust document is recorded.  None of the Defendants have challenged the existence of the Trusts, nor do they claim title from the original settlor and record owner of the Bellaire Property, Maurice Feingerts.  Quite to the contrary, they assert that the Trusts owned the Bellaire Property.  For this reason, their argument is a red herring.

Their position is also inconsistent.  Defendants claim that Mrs. Feingerts, acting as the trustee,  transferred the Trusts' interest in the Bellaire Property to D'Anna.  They simultaneously argue that the failure to record the trust document results in their ability to rely on the record owner's

right to sell.  If Defendants' position is taken to its logical conclusion, they were required to acquire the Bellaire Property from the Succession of Maurice Feingerts because the controlling Trust documents were not of record.  In order to acquire the Bellaire Property from the Succession of Maurice Feingerts, a court order authorizing the sale was necessary.[59]  No order existed.  Therefore, Defendants' reliance on La. R.S. 9:2092 is misplaced and does not help their position.

Further, the failure of Mrs. Feingerts to record the Will or extract in the conveyance records of Orleans Parish has no bearing on Feingerts' ownership.  Prior jurisprudence provides that failure of a trustee to record the trust instrument or extract does not affect the ownership of the beneficiaries and their ability to recover their property from third parties.  The Louisiana Supreme Court ruled on rehearing in *Jackson v. D'aubin*[60]:

> It has been consistently held in the jurisprudence ... that the law of registry [is] inapplicable where the ownership of, or claim affecting, immovable property ... has been acquired by inheritance and title has become vested by operation of law.[61]

In this case, the Feingerts children acquired their interests in the Trusts under the Will and by the legal theory of seizin, were immediately vested with those rights upon the death of their father.  Nevertheless, they were required by Louisiana law to obtain a judgment of possession recognizing their interests.  Upon its execution, the rights of the Feingerts children were recognized, and upon its recordation, those rights were fully protected from subsequently acquired interests of third

---

[59] *See*  La.C.C.P. Art. 3261, which has been in effect since 1960.

[60] *Jackson v. D'Aubin*, 338 So.2d 575, 580 (La. 1976), *overruled on other grounds by Bartlett v. Calhoun*, 412 So.2d 597 (La. 1982).

[61] *Id.* at 580.

persons.   The later termination of the trust through its resolutory condition gave them perfect

ownership by operation of law.

### 4.  Defendants Were "On Inquiry" as to  Feingerts' Rights

 The *Judice* opinion discussed above, illustrates both the strength of the public records doctrine and

alludes to a limitation.  In the opinion, the *Judice* Court noted,

> Where such a recorded instrument has language that fairly puts a third person "on
> inquiry as to the title, and he does not avail himself of the means and facilities at
> hand to obtain knowledge of the true facts, he is to be considered as having bought
> at his own risk and peril."[62]

What constitutes a set of facts sufficient to put a person "on inquiry" as to the title holder is

properly addressed on a case by case basis.  In *Judice*, the assignment referred to the lease with

Judice.  However, the lease itself was not recorded.  As a result, the Court found that Franklin was

under no obligation to search for an unrecorded document even if on notice that one might exist.

Instead, Franklin was entitled to rely on the absence of a recorded lease because Louisiana law

required its recordation in order to be effective against third parties.

In *Wells v. Joseph,*[63] the court came to a different result.  In *Wells*, Joseph owned property

occupied by him and his "concubine."  Shortly before Joseph died, the property was sold at tax sale

to Killen.  The tax sale was recorded.  After Joseph's death, Eva Joseph was recognized as Joseph's

sole heir and set into possession by a Judgment of Possession which was recorded.  Thereafter she

redeemed the tax sale but did not record the certificate of redemption.  The concubine instituted a

possessory action against Eva Joseph recording a notice of *lis pendens*.  Eva Joseph sold the property

---

[62] *Judice*, *supra* at 992 (citing *Brown v. Johnson, Wells v. Joseph, Pittsburgh Plate and Class Company v. Woodcock ,Wood v. Morvant*).

[63] *Wells v. Joseph*, 101 So.2d 667 (La. 1958).

to Bennett who filed an eviction action against the concubine and obtained a judgment of possession which was also recorded.  Bennett then sold the property to Daspit.

Meanwhile Killen died, and his son conveyed the property to Wells.  That sale was also recorded.  Wells then sued Daspit.  The certificate of redemption on the Killen tax sale was filed after the institution of suit.

Based on the public record, Killen's son held title to the property by virtue of a tax sale. Despite the litany of transfers and litigation present on the record, the certificate of redemption was not of record.  Killen argued that since he purchased the property based on a recorded tax title and since there was no act of redemption of record, he was entitled to rely on its absence.  Therefore, the existence of an unrecorded redemption could have no effect on him.

The Supreme Court began by acknowledging that under the public records doctrine, it would normally have no difficulty in confirming Killen's title.  However, while the record as to Killen appeared true, the record also revealed that there were several other parties with claims to the property.  As a result, Killen knew when he purchased the property that he would have to bring a lawsuit to establish his ownership.  Because of this, the Court found that the public record put Killen on notice of inquiry.

Still another example of the exception can be found in the case of *Wood v. Morvant.*[64]  In *Wood* a dispute arose between two (2) owners with competing chains of title. The first owner, Morvant, claimed by a deed containing an erroneous property description.  The second, Wood, claimed by a deed with the correct description.   Morvant alleged that the existence of his deed placed Wood "on inquiry" to her claims.  Wood argued that  because the property description was

---

[64] *Wood v. Morvant*, 321 So.2d 914 (La. App. 1 Cir. 1975).

incorrect, he was not on notice of Morvant's interest and entitled to rely on the public record or absence of a deed.   The Court began by examining the property description contained in Morvant's deed.  After finding it in error, the Court noted that it referred to both a mortgage and previous deed which contained the correct property descriptions.   Further, based on the description in the document, the Court found that a person could determine the actual property affected by reference to the official township maps on file in the office of the Clerk of Court. As a result, it held that Wood was on inquiry as to Morvant's claims.

In this circumstance, Defendants were aware of several critical facts prior to the Sale. Defendants knew that Mrs. Feingerts owned one-half of the Bellaire Property and allegedly was trustee of Trusts owning the other one-half.     While Defendants claim they are entitled to rely on Mrs. Feingerts' authority, as previously explained, Louisiana law is clearly at odds with their position. Under the Civil Code, they are not entitled to rely on any representations as to capacity or authority contained in a recorded document.  Instead, the nature and extent of Mrs. Feingerts' authority were subject to verification by means other than the public record, and Fidelity and Crescent conducted a search of the succession records for just this reason.

The search of the Orleans Parish Civil Court records produced the Will.  Although not contained in the mortgage or conveyance records, the Will was of public record in the Maurice Feingerts' succession.  Filed in Civil District Court for Orleans Parish and probated by the same Court issuing the Judgment of Possession, it was readily available and found by Crescent and Fidelity prior to the Sale.   The Will dated February 18,1966, clearly set forth the ages of the Feingerts children and provided that upon each reaching the age of thirty-one (31), their trust would terminate. Given that Maurice Feingerts died on July 19, 1967, under any calculation, more than

thirty-one (31) years had lapsed.  Therefore, from the face of the document, it was evident that Mrs.

Feingerts' authority had lapsed due to the termination of the Trusts.

Prior to the Sale, Defendants  possessed written and recorded (in fact probated)

documentation to refute Mrs. Feingerts' representations as to her capacity and authority.  This, at a

minimum, placed them "on inquiry" as to her right to transfer title.  Defendants ignored this clear

evidence regarding Mrs. Feingerts' lack of authority and capacity in proceeding to sale.  They did

so at their own risk and peril.

### 5.  La. R.S. 9:2029.1

La. R.S. 9:2029.1 provides:

> If a trust owns immovable property at the time the trust terminates and the date of
> termination is not discernable on the face of the recorded trust agreement or extract
> of trust, the termination shall not cause the dispositive provisions of the trust to have
> their ultimate effect insofar as third persons are concerned until an act evidencing
> such termination has been recorded in the conveyance records of the clerk of court
> for the parish in which the immovable property is located.

Defendants argue that La. R.S. 9:2029.1 requires the execution and recordation of an act of

termination in order for it to have an effect on third parties.  Because an act of termination was not

signed, much less recorded, they argue that Mrs. Feingerts continued to hold the Bellaire Property

in trust through the Sale date.  La. R. S. 9:2029.1 became effective on August 1, 2015, almost six

(6) years following the Sale and over thirty-two (32)  years after Feingerts acquired his ownership

interest in the assets of the Trust.  Thus, in order to prevail, the statute must be applied retroactively.

There is no indication that it is retroactive.  La. C.C. Art. 6 provides:

> In the absence of contrary legislative expression, substantive laws apply
> prospectively only.  Procedural and interpretative laws apply both prospectively and
> retroactively, unless there is a legislative expression to the contrary.

24

Defendants contend that La. R.S. 9:2029.1 is not substantive, but is an interpretative statute that clarifies or explains prior law. D'Anna attached to her post-trial brief the affidavit of Steven Y. Landry. Landry, a title attorney on the Legislative Committee of the Louisiana Land Title Association, testified before the Louisiana House of Representatives Civil Law and Procedure Committee regarding House Bill 687, which proposed the addition of La. R.S. 9:2029.1. His affidavit provides:

> Appearer understands the bill was introduced to clarify existing law regarding the Public Records Doctrine to make clear that third parties dealing with trust property could rely on the continued existence of a trust and the presumptive rights of the trustee where the public records were silent as to the trust's termination provisions or limitations on the trustee's rights. It was Appearer's understanding that it was not intended to change the law, only to clarify it.[65]

D'Anna also cited a link to a video of the hearing.[66] In the video, Representative Chris Hazel, who introduced the bill, said, "This deals with provisions in trust documents that [ ] don't always show up on the public record. That causes real problems for title examiners."

In the video Landry testified:

> When a trust terminates, the dispositive provisions of the trust document come into effect. So, at that point, the beneficiary is going to get whatever property is owned by the trust at that time. This particular first section deals with what happens when immovable property is owned by the trust at the time the trust terminates. ***Present law says that when the trust terminates that the dispositive provisions of the trust take effect, which means that the beneficiary now owns the trust property. This creates a problem in immovable property when what's recorded in the public records does not tell [ ] third persons and title examiners when the trust terminates.*** So, what this section does, it adds a section to the trust code, and it provides that if the trust extract or trust instrument clearly gives the termination date on the recorded document in the immovable property records, then the dispositive provisions do take

---

[65] P-70, Exh. A.

[66] Video of House Committee on Civil Law and Procedure meeting from 4/21/15: http://house.louisiana.gov/H_Video/VideoArchivePlayer.aspx?v=house/2015/apr/0421_15_CL

effect. The beneficiary gets the property. However, if there's nothing recorded in the immovable property records that indicates that the trust is terminated, then there is no way for third parties to know that. Then, third parties are not ... can still deal with the trustee and trust that the trustee is still ... has the authority to deal with immovable property. And, in the situation where you cannot tell by looking at the public records that the trust is terminated, the trustee is going to have to record something showing that it has terminated or record something transferring the property to the beneficiary.[67]

Landry was clear that under the previous law, when a trust terminated, the beneficiary became the owner of the immovable property in the trust.[68]   The very fact that Landry admitted to a "problem" for title examiners in just this situation contradicts Defendants' allegations that Louisiana law always required a notice of termination when transferring immovable property to a beneficiary.[69]

If Defendants' position is true, the retroactive application of La. R.S. 9:2029.1 would divest Feingerts of his ownership interest by retroactively requiring the recordation of an act of termination when no such requirement previously existed.   As made clear by Landry, Feingerts became a one-sixth (1/6) owner of the Bellaire Property when he reached age thirty-one (31).  More importantly, Mrs. Feingerts lost authority to manage or alienate the Bellaire  Property on that same day. Louisiana law did not require that anything further be done to accomplish this result.  Thus, as of the Sale date, Mrs. Feingerts clearly lacked the capacity and authority to sell Feingerts' share of the Bellaire Property.  Retroactively taking away Feingerts' right to rely on the Trust's termination and

---

[67] *Id.* (emphasis added).

[68] La. R.S. 9:2029 provides that "[a] termination of a trust causes the dispositive provisions of the trust to achieve their ultimate effect."  *See also Roberts v. Anderson*, 733 F.Supp. 1040, 1051 (E.D.La. 1990); and *McAllister v. Federal Savings and Loan Ins. Corp.*, 709 F.Supp. 697, 701 (M.D.La. 1989).

[69]  The Court also notes that Landry's testimony before the committee is not proof of law. The law is based on jurisprudence and statute, not the opinions of witnesses given before a legislative body.

his mother's automatic loss of authority would certainly be substantive, particularly as to a sale that occurred over six (6) years before the statute was enacted.   For this reason, the Court finds that La. R.S. 9:2029.1 creates a substantive change in the law and, therefore, may not be applied retroactively.

This Court concludes that  prior to August 1, 2015, Louisiana law did not require the recordation of a notice of trust termination to protect the rights of the beneficiary against those of a third party purchaser.  As a result, Defendants are not entitled to rely on the absence of a notice of termination in defending D'Anna's title to the Bellaire Property.

### C.  Liability of Mrs. Feingerts' Succession to D'Anna

#### 1.  Basis For Liability

D'Anna filed a third party demand against the Succession for breach of warranty of title.[70] The Sale was made "with all legal warranties as to title,"[71] including a warranty against eviction.[72]

According to Louisiana law:

> The seller warrants the buyer against eviction, which is the buyer's loss of, or danger of losing, the whole or part of the thing sold because of a third person's right that existed at the time of the sale.[73]

---

[70] Pursuant to La. C.C.P. Art. 734, the succession representative "is the proper defendant in an action to enforce an obligation of the deceased."  Therefore, the Succession was the proper defendant in an action against Mrs. Feingerts.

[71] Exh. 3.

[72] A warranty against eviction is implied in every sale unless specifically excluded. La. C.C. Art. 2503.

[73] La. C.C. Art. 2500.   D'Anna seeks rescission of the sale rather than damages pursuant to La. C.C. Art. 2511 for "partial eviction."  The Revision Comments to La. C.C. Art. 2511 cite *Guglielmi v. Geismer*, 16 So. 742 (La. 1895), as an example of partial eviction.  *Guglielmi* involved a case where the seller sold the buyer more acreage than he actually owned.   The buyer

A buyer who is threatened with eviction by a third party may:

> ...[R]ecover from the seller the price he paid, the value of any fruits he had to return to the third person who evicted him, and also other damages sustained because of the eviction with the exception of any increase in value of the thing lost.[74]

The sellers of the Bellaire Property were listed as Mrs. Feingerts and the Trusts, which had terminated and no longer existed. Mrs. Feingerts transferred her interests, and Hackmeier and Rushing quit claimed theirs to D'Anna. However, the one-sixth (1/6) interest held by Feingerts was not transferred because Mrs. Feingerts lacked both capacity and authority over the Bellaire Property.

Mrs. Feingerts attempted to transfer the interest of her children as trustee of the Trusts, but the Trusts were no longer in existence as they terminated when the children reached age thirty-one (31). Mrs. Feingerts is personally liable to D'Anna because she knowingly misrepresented not only her authority but capacity to sell.

> A mandatary who exceeds his authority is personally bound to the third person with whom he contracts, unless that person knew at the time the contract was made that the mandatary had exceeded his authority or unless the principal ratifies the contract.[75]

Mrs. Feingerts breached the warranty of eviction she made to D'Anna by transferring less than the whole Bellaire Property. This breach is a failure of cause: the thing sold to D'Anna was not owned by Mrs. Feingerts nor did she have the authority to transfer it on behalf of another. D'Anna

---

was evicted from a definite portion of the property, rather than a fractional interest in the whole.

[74] La. C.C. Art. 2506.

[75] La. C.C. Art. 3019.

is entitled to return of the purchase price ($127,000) and damages.  However, attorney's fees are not recoverable from the seller.[76]

A seller who breaches the warranty of eviction must also "reimburse the buyer for the cost of useful improvements to the thing made by the seller."[77]  If the seller knew at the time of the sale that the third person had an interest, the seller must reimburse the buyer for *all* improvements.[78]  As former trustee of the Trusts, Mrs. Feingerts had knowledge that the Trusts terminated when her children reached age thirty-one (31).  "We know of no law or jurisprudence that relieves a person for failure of memory."  *Collins v. Slocum*, 317 So.2d 672, 680 (La.App. 3 Cir. 1975).  That a party may have forgotten at the time of the sale is irrelevant if the party had actual knowledge.  Therefore, the Succession must reimburse D'Anna for the cost of all improvements she made to the Bellaire Property.

The Succession contends that D'Anna is only entitled to recover for partial eviction because five-sixths (5/6) of the property was transferred to her.  La. C.C. Art. 2511 provides:

> When the buyer is evicted from only a part of the thing sold, he may obtain rescission of the sale if he would not have bought the thing without that part.

The Bellaire Property is a residence and was purchased by D'Anna as her residence.  D'Anna testified that she would not have bought five-sixths (5/6) of the Bellaire Property had she known of Feingerts' claims.  The Court accepts this testimony as credible given the nature of the Bellaire

---

[76] *Guthrie v. Rudy Brown Builders, Inc.*, 416 So.2d 590 (5th Cir. 1982).

[77] La. C.C. Art. 2509.

[78] *Id*.

Property.  Defendants have offered no evidence to the contrary.  Therefore, D'Anna has the right to rescind the Sale.[79]

The Succession also claims that rescission is not possible because there is a mortgage on the on the Bellaire Property, and D'Anna has defaulted on the Note.  The mortgage debt constitutes a portion of the purchase price given to Mrs. Feingerts.  If the Sale is rescinded, the Note will be repaid from a return of the purchase price, damages, and costs of improvements.  Alternatively, the Succession may take the Bellaire Property subject to the Mortgage with a full indemnification in favor of D'Anna and receive a credit on the amounts due.

Fidelity and Crescent maintain that rescission is impractical, and Feingerts should be allowed monetary damages rather than an interest in the Bellaire Property.  They cite La. C.C. Art. 2033 which provides:

> An absolutely null contract, or a relatively null contract that has been declared null by the court, is deemed never to have existed.  The parties must be restored to the situation that existed before the contract was made.  If it is impossible or impracticable to make restoration in kind, it may be made through an award of damages.

When interpreting two (2) statutes, the specific controls over the general.[80]  Louisiana law has specific provisions for damages in warranty of eviction, and monetary damages to the co-owner are not included in the choice of remedies available.   The Court also finds that in this instance, rescission is practicable because upon the return of the purchase price or the granting of a credit for

---

[79] The Court notes that D'Anna dismissed her claims against Hackmeier and Rushing following their quit claim of any interests they held in the Bellaire Property to her.  Robert Bergeron, an attorney at Crescent Title, testified that the entirety of the sales proceeds was paid to Mrs. Feingerts in one check.  Tr. T. 9/30/15  p. 257.

[80] *State of Louisiana in the Interest of A.C.*, 643 So.2d 719, 729 (La. 1994).

the Note balance, the Bellaire Property can be returned to its owners who are also the heirs of the Succession.

The Succession contends that the State Court found Feingerts had been given a credit for his interest in the Bellaire Property, so he cannot now claim a one-sixth (1/6) interest.  However, the Reasons for Judgment entered by the State Court on October 25, 2013, do not address Mrs. Feingerts' authority to sell the Bellaire Property.[81]  On appeal from the State Court ruling, the Appellate Court found in its opinion:

> [Feingerts's] argument that the succession has to deliver his interest in the Property because its sale was invalid is not properly before us.  That issue is being litigated in a separate district court proceeding.[82]

As this Court found above, Mrs. Feingerts did not have authority to sell Feingerts' interest in the Bellaire Property to D'Anna.  Any claims between Feingerts and the Succession are not before this Court as this Court's lacks jurisdiction over them.[83]

The Succession has also raised affirmative defenses in its Answer.[84]  The Succession first alleges that petitioners have no right or cause of action against it. The Succession also avers that all allegations against it are barred by error, mistake, estoppel, or prescription.

---

[81] Exh. 54.

[82] *Id.*

[83] *Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

[84] Case 15-1045, P-1, p. 10 and 33.

Allegations of no right or cause of action are usually made in a motion to dismiss pursuant to F.R.C.P. 12(b)(6). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."[85] Louisiana law provides a right of action by a purchaser against a seller who lacked authority to transfer. D'Anna's allegations that Mrs. Feingerts lacked authority to transfer the Bellaire Property along with the factual allegations plead sufficiently assert a cause of action against the Succession.

The Succession has not met its burden of proof as to the defenses that all allegations against it are barred by error, mistake, estoppel, or prescription as it introduced no evidence to support them.

The Court finds that the Succession breached the warranty of eviction and is liable to D'Anna for the purchase price, damages, and the cost of improvements. Damages include interest associated with the loan,[86] insurance,[87] finance charges,[88] property taxes,[89] and court costs.[90]

## 2. Damages Owed to D'Anna by the Succession

According to Exhibit 4, the HUD closing statement, the purchase price for the Bellaire Property was $127,000.00 plus settlement charges of $11,817.01 and prorated property taxes of

---

[85] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 55, 127 S.Ct. 1955, 1965 (2007) (citations omitted).

[86] *Collins v. Slocum*, 317 So.2d 672 (La.App. 3 Cir. 1975).

[87] *Id.*

[88] *Forrest v. Watts & Behrnes*, 47 So.2d 112 (La.App. 1 Cir. 1950).

[89] *Abney v. Levy*, 125 So. 76 (La.App. 1 Cir. 1929).

[90] *Cooper v. Burson*, 521 So.2d 745, 748 (La.App. 2 Cir. 1988) (citing La. C.C. Art. 2506). Although the wording of La. C.C. Art. 2506 is different today, the Revision Comments from 1993 provide that "[i]t does not change the law."

$582.05.   The amounts were satisfied by a BOA loan of $127,000.00[91] and $12,070.00 in cash.  In

addition, D'Anna proved other  damages:

1) Interest accrued on the Note from execution through January 31, 2016, of $46,857.58;[92]

2) Payment of property taxes totaling $14,096.04;[93]

3) Payment of hazard insurance totaling $16,538.86;[94]

4) Payment of flood insurance totaling $7,175.14;[95] and

5) Court costs of $2,714.46.

D'Anna is also entitled to recover the costs of improvements she made to the Bellaire Property.  The

Court accepts her testimony and evidence and calculates the total costs of improvements to be

$49,314.93.[96]   Therefore,  D'Anna  is  entitled  to  recover  from  the  Succession  for  breach  of  the

warranty of eviction a total of $276,096.10.

---

[91]   The BOA loan included not only funds to purchase but also funds to renovate the
Bellaire Property.  The entire advance was $158,608.00 of which $34,575.74 was for
improvements.  Only the funds advanced to purchase ($127,000) are included in the Judgment as
costs of improvement are separately calculated.

[92]   Tr. T. 9/30/15 p. 178.  Interest accrued at the rate of 5.75% per annum on the loan
amount for purchase ($127,000).  As of the date of trial, $148,401.68 in principal remained
outstanding.  Therefore, the entire amount advanced for the purchase remains outstanding.
Interest of $608.54 per month from July 30, 2009, to February 29, 2016, (78 months) totals
$47,466.12.

[93]   *Id.* at p. 175-176.

[94]   *Id*. at 176-178.

[95]   *Id.*

[96]   Exh. 8 and 15; Tr. T. 9/30/15, pp. 181-184, 192-197.

D'Anna claims she is entitled to judicial interest from the date of default against the Succession, which is the date of the Sale. D'Anna cited *Catchings and Assoc. v. City of Baton Rouge*[97] which found that damages for breach of contract are due from the date of default under the contract: "An obligee is entitled to interest from date of default, rather than from date of judgment or from date of judicial demand."[98]

La. C.C.P. Art. 1921 provides, " The Court shall award interest in the judgment as prayed for or as provided by law."  For actions in tort, legal interest attaches from the date of judicial demand.[99] However, breach of warranty of sale is an action in contract.

Several cases involving the breach of warranty of eviction hold that legal interest is due from the date the sale price was paid.[100]  These cases are in line with *Catchings*, which provides for judicial interest on breach of contract from date of default.   This also complies with La. C.C. Art. 2000  which provides:

> When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement at the rate of legal interest fixed by R.S. 9:3500.

---

[97] *Catchings and Assoc. v. City of Baton Rouge,* 621 So.2d 767 (La. 1993).

[98] *Id.* at 767.

[99]  La. R.S. 13:4203.

[100] *See Levenberg v. Shanks*, 115 So. 641 (La. 1928);  *Crowell & Spencer Lumber Co. v. Hawkins*, 179 So. 21 (La. 1938); *Whitten v. Monkhouse*, 29 So.2d 800 (La.App. 2 Cir. 1947).

However, D'Anna has already been awarded the repayment of mortgage interest on the purchase

price borrowed from BOA.  Since the rate of interest charged by BOA is greater than the legal rate,[101]

the Court will not award judicial interest on that portion of the Sale price.  Instead, D'Anna's request

for legal interest is limited to interest on her closing costs, or $12,399.06, from the date of Sale until

paid.  Because D'Anna did not establish when her costs of improvement, insurance, or taxes were

paid  with any specificity, legal interest will accrue on that portion of the award from date of

judgment until paid.  Accordingly, D'Anna is entitled to recover from the Succession for breach of

the warranty of eviction:

> 1.  Purchase price of $127,000, plus interest at the rate contained in the Note or 5.75% per annum from February 29, 2016, until paid;

> 2.  Accrued mortgage interest on the Note of  $47,466.12 through February 29, 2016;

> 3.  Closing costs of $12,399.06, interest at the legal rate from closing on July 30, 2009, until paid;

> 4.  Insurance and property tax payments of $37,810.04, plus interest at the legal rate from date of judgment until paid; and

> 5.  Improvements of $49,314.93, plus interest at the legal rate from date of judgment until paid.

### D. The Title Policy

Fidelity issued a Title Policy to D'Anna at the time of the Sale.[102]  The Title Policy insures

D'Anna against actual loss, including any costs, attorneys' fees, and expenses provided under the

---

[101]  According to the Note's terms, interest at the rate of 5.75% per annum is being charged by BOA.

[102]  Exh. 5.

35

Title Policy, as long as the loss results from a covered risk. Ownership claims by a third party are a covered risk.[103]

The Title Policy provides that once a claim is made, Fidelity has the option to:

(1) Pay the claim;

(2) Negotiate a settlement;

(3) Bring or defend a legal action related to the claim; [or]

(4) Pay [ ] the amount required by this Policy; ...[104]

### 1. Fidelity's Motion to Dismiss Party

Fidelity asserts that this Court lacks subject matter jurisdiction because D'Anna's claims are not ripe for judicial review.[105]  It contends that it "is exercising its right and option under the Policy to attempt to cure the title defect; if it succeeds, the Policy states that Fidelity shall not be liable for any loss caused by the defect."[106]  The Title Policy provides that if Fidelity "remove[s] the cause of the claim with reasonable diligence ... all [its] obligations for the claim end, including any obligation for loss [D'Anna] had while [Fidelity was] removing the cause of the claim."[107]  Fidelity contends that D'Anna's claims against it are premature because if Fidelity is able to cure the defect in title, D'Anna will have no claim against Fidelity.

---

[103]  *Id*. at p. 52.

[104]  *Id.* at p. 55.

[105]  Case 15-1045, P-28.

[106]  Case 15-1045, P-28, p. 3.

[107]  Exh. 5, p. 55.

A claim is not ripe for adjudication "when the case is abstract or hypothetical."[108] There are two (2) key factors in whether a case is ripe for adjudication: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."[109] "A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required."[110]

The Court has ruled that Feingerts is a one-sixth (1/6) owner of the property, so the defect in title has not been cured. No further factual development is required, and dismissing Fidelity would be a waste of judicial resources and a hardship to D'Anna.

Fidelity maintains that any ruling against it is premature because it is entitled under the Title Policy to "appeal any decision to the highest level," and it is not required to pay D'Anna's claim until there is a final ruling.[111] Obviously, any ruling by this Court is subject to appeal, but Fidelity's obligation to pay will be dependent on a request for stay of the judgment pending appeal. The Motion to Dismiss Party filed by Fidelity is denied.

## 2. The Amount of D'Anna's Claim

Feingerts' claims against the Bellaire Property have been in litigation since July 2012. By the terms of the Title Policy, Fidelity's obligation to D'Anna has not ended. D'Anna has the right

---

[108] *New Orleans Public Service, Inc. v. Counsel of City of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987).

[109] *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980 (1977).

[110] *New Orleans Public Service, Inc. v. Counsel of City of New Orleans*, 833 F.2d at 587.

[111] Case 15-1045, P-28, p. 3 (quoting Exh. 5, p. 55).

to have her actual loss determined on either the date she made the claim or the date the claim was settled and paid.[112]

The Title Policy's face amount is $158,608; however, there is an appreciation clause in the Title Policy that provides:

> The Policy Amount then in force will increase by ten percent (10%) of the Policy Amount shown in Schedule A each year for the first five years following the Policy Date ... up to one hundred fifty percent (150%) of the Policy Amount...

Due to the passage of time, the Title Policy face limit is now $237,912. In addition, because the defect in title was not cured, 10% of the policy amount now enforce is added, and the policy limit increases to $261,703.20.[113]

D'Anna has a deductible of 1% or $2,617.03.[114] The Title Policy provides that after subtracting the deductible, Fidelity's liability is limited to the lesser of:

> (1) Actual loss;
>
> (2) ...; or
>
> (3) the Policy amount then in force and any costs, attorneys' fees and expenses that We are obligated to pay under this Policy.[115]

D'Anna's losses include monies paid for the purchase, interest on the purchase price under the Mortgage, property taxes, and insurance totaling $276,096.10 without additional legal interest on the award. Because D'Anna's losses are greater than the Title Policy amount in force, the Court

---

[112] Exh. 5, p. 55.

[113] Exh. 5, p. 63, ¶ 8(b)(i).

[114] Exh. 5, p. 57.

[115] Exh. 5, p. 55.

need not rule on Fidelity's argument that "actual loss" does not include fair market value. However, in an abundance of caution, the Court will address it.

The Title Policy provides that Louisiana law is applicable.[116]

Louisiana law provides that an insurance policy is a contract between the parties and should be construed using the general rules of contract interpretation set forth in the Louisiana Civil Code.  The words used in an insurance policy must be given their generally prevailing meaning.  "[W]hen the 'language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation.'" Further, each provision of an insurance policy "must be interpreted by the contract as a whole."[117]

Because "actual loss" is not defined in the Title Policy,

To determine the generally prevailing meaning in an insurance contract, Louisiana courts often resort to the use of *Black's Law Dictionary*.  According to *Black's*, "actual loss" is "[a] loss resulting from the real and substantial destruction of insured property." *Black's* make reference to "actual loss" when it defines "actual damages" as "[a]n amount awarded to a complainant to compensate for a proven injury or loss; damages that repay actual losses."  In contrast, *Black's* separately defines "consequential loss" as "[a] loss arising from the results of damage rather than from the damage itself," and  notes that it is "[a]lso termed *indirect loss; consequential injury*."  According to *Black's*, "consequential damages" entail "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act."  A plain reading of "actual loss or damage" does not include "consequential loss" or "consequential damage."[118]

"Ambiguous policy provisions are generally construed against the insurer and in favor of coverage."[119]

---

[116] Exh. 5, p. 56.

[117] *First American Bank v. First American Transp. Title Ins. Co.*, 585 F.3d 833, 837 (5th Cir. 2009) (citations omitted).

[118] *Id.* at 838-839.  In  *First American*, the policy covered "actual loss or damage."

[119] *Cadwallader v. Allstate Ins. Co*., 848 So.2d 577, 580 (La. 2003) (citations omitted).

D'Anna contends that the fair market value of the Bellaire Property is an "actual loss." Fidelity cited a title policy treatise that provides in the event of a total failure of title, a measure of actual loss is fair market value:

> The measure of loss of an owner's complete failure of title is the fair market value of the property on the date of the loss, or the policy limits, whichever is less. Payment to the insured of the fair market value as of the date of the loss is deemed to compensate the insured in full for his or her "actual monetary loss or damage," which policy declares to be the measure of loss.  If the value of the property has fallen between the date the insured purchased it and the date of loss, loss is limited to the value as of the date of loss.[120]

On the other hand, Fidelity also cited *Amzak Capital Management  v. Stewart Title of Louisiana (In re W. Feliciana Acquisition, LLC)*[121] for the proposition that "title insurance does not guarantee or protect a property's fair market value."[122]  However, *W. Feliciana*  is not on point.  In *W. Feliciana*, Amzak Capital Management ("Amzak") loaned funds to West Feliciana Acquisition, LLC ("WFA") in Texas, with a paper mill as collateral.  WFA defaulted on payments and eventually filed for bankruptcy protection, causing the paper mill to close and WFA's value to decrease. Amzak filed suit against its title company.   The Court found that the title company contracted to indemnify against actual loss "only in the event that loss resulted from failure of title."[123]   The Court

---

[120] Case 15-1045, P-72, p. 12-13 (citing J. Bush Nielsen, <u>Title and Escrow Claims Guide</u> 109 (Ed. 2014)).

[121] *Amzak Capital Management v. Stewart Title of Louisiana (In re W. Feliciana Acquisition, LLC)*, 744 F.3d 352 (5th Cir. 2014).

[122] Case 15-1045, P-72, p. 12.

[123] *W. Feliciana*, 744 F.3d at 357-358.

found that since title did not fail, "[i]nsurance against the results of a title defect is not the same as insurance against a loan loss or the value of the collateral."[124]

Fidelity also cited *First American State Bank v. American Title Insurance Co.,*[125] another Texas law case, for the proposition that it cannot be held liable for the market value of the Bellaire Property. In *First American*, Allied Chain Link Fence Co. ("Allied") executed a note and mortgage in favor of First State Bank of Corpus Christi ("Bank") for $340,311.93, using as collateral two tracts of land owned by its principals. American Title Insurance Co. ("American") issued a title policy to the Bank for the amount of the note. Allied defaulted on the note, and the Bank sought to foreclose on the collateral. The principals who owned the collateral filed for bankruptcy protection. After the stay was lifted, the Bank foreclosed on the property and purchased it for $154,070.01. The principals sued American in Texas state court on the grounds that the property was a business homestead, so the lien was void. American settled with the principals. The Bank sued American for breach of the title policy by refusing to indemnify it for a decrease in fair market value and failing to settle with the principals in a timely manner.

The *First American* Court ruled that as to the claim by principals, title never failed; therefore, American was not liable under the title policy. As to the breach of policy claim for failure to indemnify, the Court ruled that American was not liable for the diminution in market value that occurred while it was exercising its right to litigate the claim. The case at bar is distinguishable from

---

[124] *Id.* at 357.

[125] *First American State Bank v. American Title*, 91 F.3d 141, 1996 WL 400322 (5th Cir. 1996).

both *W. Feliciana* and *First American* because it involves a buyer's suit against its title company for damages occurring from a failed title.

Under the Title Policy, D'Anna "shall have the right to have the actual loss determined on either the date the claim was made ... or the date it is settled and paid."[126]

In *Allison v. Ticor Title Ins. Co.*,[127] the Seventh Circuit found that a purchaser's actual loss was the fair market value on either the date the defect was discovered or the date of judgment, rather than the purchase price.

A California court found in *Overholtzer v. Northern Counties Title Ins. Co.*[128]:

> When a purchaser buys property and buys title insurance, he is buying protection against defects in title to the property. He is trying to protect himself then and for the future against loss if the title is defective. The policy necessarily looks to the future.

In *First American Bank v. First American Transp. Title Ins. Co.*,[129] the Fifth Circuit cited *Overholtzer* and *Allison* stating:

> Although date-of-discovery is the majority rule for owners' policies, its use is generally justified on the ground that the owner of property suffers a loss immediately upon discovery of a defect, a rationale that is also not applicable to mortgagees.

This case is a case on an owner's policy, not a mortgagee policy. Therefore, the Court finds that D'Anna is entitled to recover under the Title Policy the fair market value of the Bellaire Property

---

[126] Exh. 5, p. 55.

[127] *Allison v. Ticor Title Ins. Co.*, 907 F.2d 645 (7th Cir. 1990).

[128] *Overholtzer v. Northern Counties Title Ins. Co.*, 116 Cal.App.2d 113, 125, 253 P.2d 116, 130. (CalApp. 1953).

[129] *First American Bank v. First American Transp. Title Ins. Co.*, 759 F.3d 427, 433 (5th Cir. 2014).

as of the date suit was instituted against her, July 30, 2012.[130]   However, the liability of Fidelity is capped at the policy limit of $261,703.20.

### 3. Fidelity's Remaining Allegations

Fidelity plead several defenses in its Answer to the Third Party Complaint by D'Anna.[131] Fidelity averred that D'Anna failed to state a cause of action upon which relief could be granted. Such an allegation is usually made in a motion to dismiss pursuant to F.R.C.P. 12(b)(6). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true."[132]   In her Third Party Demand, D'Anna alleged:

> [I]f there are issues with D'Anna's title to the property, [Fidelity's] insurance policy covers any and all defects and or damages associated with such issues. ... [Fidelity] as a result is therefore liable for any [and] all damages stemming from issues with the title of the subject property...[133]

The Court finds that D'Anna's Third Party Demand against Fidelity sufficiently stated a claim upon which relief may be granted.

Fidelity also averred:

> Fidelity has no obligation under the Policy unless and until all terms, provisions, and conditions, including condition precedent or subsequent, have been satisfied. To the extent D'Anna has not satisfied or has violated any conditions precedent or

---

[130] The appraisal of the Bellaire Property is as of November 19, 2014. Exh. 7. Nothing in the record indicates the value of the Bellaire Property on July 30, 2012.

[131] 15-1045, P-24. The Third Party Demand by D'Anna against Fidelity was made in adversary 15-1018, P-3.   However, Fidelity filed its Answer in adversary 15-1045.

[132] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 55, 127 S.Ct. 1955, 1965 (2007) (citations omitted).

[133] 15-1018, P-3, ¶ 6 and 7.

> subsequent identified in the policy, or has failed to comply with all the terms in the
> policy, Fidelity has no liability under the [p]olicy.

The Court finds that all conditions  precedent and subsequent were satisfied and that D'Anna

complied with all terms of the policy.

Fidelity further asserts that D'Anna "may be wholly or partially barred by the doctrines of

equitable estoppel, judicial estoppel, waiver, error, laches, unclean hands, and/or any applicable

statutes of limitations or prescriptive period."   Fidelity has not met its burden of proof as to these

allegations as it introduced no evidence to support them.

Fidelity also asserts  the  defense  that D'Anna failed to mitigate damages.   Fidelity has not

met its burden of proof as it did not introduce evidence to support this allegation.

Fidelity further asserts that any fault of D'Anna as well as external  factors reduce or bar her

recovery:

> [A]ny errors, acts, omissions, negligence, or fault of Ms. D'Anna, and/or the
> economic decline, recession, and/or depression, or Act of God should operate
> completely to bar recovery against Fidelity, or alternatively, to reduce any recovery
> by Ms. D'Anna.

The Court finds that D'Anna is not at fault.   Also, there is no economic decline, recession,

depression, or Act of God that bar or reduce her recovery.

Fidelity's next defense is that D'Anna's recovery should be reduced by her comparative

negligence.   The Court finds no negligence on the part of D'Anna.

Fidelity's final defense is that if it is found to liable to D'Anna, it is entitled to contribution

or indemnity from others.   As stated above, this Court has no jurisdiction over the claims of Fidelity

against other parties.

### 4. Liability for Costs, Attorneys' Fees, and Expenses

D'Anna contends that the attorneys' fees of Ricci Partners, LLC in the amount of $88,635.25[134] are recoverable from Fidelity under the Title Policy. The Title Policy provides that Fidelity is required to repay D'Anna "for those settlement costs, attorneys' fees and expenses" that Fidelity approves in advance.[135] Fidelity did not approve D'Anna's hiring of Ricci Partners, LLC.

Except where there is a contractual or statutory obligation, attorney's fees are not recoverable.[136] The Title Policy clearly provides that Fidelity will only pay attorneys' fees it approves in advance. Therefore, Fidelity is not liable for the attorneys' fees of Ricci Partners, LLC.

In an effort to quiet title, Fidelity did retain the services of Seale, Smith, Zuber & Barnette. Under the policy, Fidelity must pay the costs and fees of Seale, Smith, Zuber & Barnette in addition to the Title Policy amount. The Title Policy provides:

> Our Duty to Defend Against Legal Actions. We will defend your title in any legal action only as to that part of the action which is based on a Covered Risk and which is not excepted or excluded from coverage in this Policy. We will pay the costs, attorneys' fees and expenses We incur in that defense.[137]

### 5. Fidelity's Rights Upon Settlement

Fidelity claims the right to satisfy its costs and expenses from any sums paid by the Succession to D'Anna. In the event Fidelity settles D'Anna's claim against it, the Title Policy provides:

---

[134] Exh. 56.

[135] Exh. 5, p. 55.

[136] *Winkler v. Ascension Bank & Trust Co*., 161 So. 23, 26 (La. 1935).

[137] Exh. 5, p. 53. *See also* Exh. 5, p. 55, ¶6.d: "All payments We make under this Policy reduce the Policy Amount then in force except for costs, attorneys' fees and expenses."

45

7.  <u>TRANSFER OF YOUR RIGHTS TO US</u>

      a. *When We settle Your claim*, We have all the rights and remedies You have against any person or property related to the claim. ...

      c. We will pay any money We collect from enforcing these rights and remedies in the following order:

            (1) to Us for the costs, attorneys' fees and expenses We paid to enforce those rights and remedies;

            (2) to You for Your loss that You have not already collected;

            (3) to Us for any money We paid out under this Policy on account of Your claim;

            (4) to You whatever is left.[138]

Therefore, under the Title Policy, Fidelity must first settle D'Anna's claim.  Only then is it entitled to pursue the Succession for reimbursement.  In that event, any funds received from the Succession will be applied:

    1.  To reimburse Fidelity for the costs and expenses of pursuing the Succession; then

    2.  To losses not covered by the Title Policy, specifically all damages in excess of the Policy limits and interest; then

    3.  To all amounts paid by Fidelity on the claim; then

    4.  Any excess to D'Anna.

Under the clear reading of the Title Policy, Fidelity is not entitled to reimburse itself for the costs or expenses of defending title until, 1) it settles the claim against D'Anna, and 2) pays D'Anna for any damages awarded in excess of the Title Policy amount.

---

[138] *Id.* at p. 56 (emphasis added).

### E.  Feingerts Has No Liability To D'Anna

D'Anna contends that if Feingerts is found to be her co-owner, he is liable to her for

"reimbursement [of] all expenses incurred for the maintenance, repair and management" of the

Bellaire Property pursuant to La. C.C. Art. 806 and the value of improvements pursuant to La. C.C.

Art. 496.[139]

> La. C.C. Art. 806 provides:
>
> A co-owner who on account of the thing held in indivision has incurred necessary expenses, expenses for ordinary maintenance and repairs, or necessary management expenses paid to a third person, is entitled to reimbursement from the co-owners in proportion to their shares.
>
> If the co-owner who incurred the expenses had the enjoyment of the thing held in indivision, his reimbursement shall be reduced in proportion to the value of the enjoyment.

D'Anna did not introduce evidence as to expenses she incurred, and there is no dispute that she had

the full enjoyment of the Bellaire Property.   Therefore, Feingerts is not liable to D'Anna for

expenses.

> La. C.C. Art. 496 provides:
>
> When constructions, plantings, or works are made by a possessor in good faith, the owner of the immovable may not demand their demolition and removal.  He is bound to keep them and at his option to pay to the possessor either the costs of the materials and of the workmanship, or their current value, or the enhanced value of the immovable.

Because the Sale will be rescinded and the Succession will pay D'Anna the cost of improvements,

this article is not applicable.

---

[139] Case 15-1045, P-1, Exh. 3, Answer to Plaintiff Bruce L. Feingerts' Petition for Partition By Private Sale and for Reimbursement of Expenses and Reconventional Demand Filed on Behalf of Defendant Ronda Wortmann D'Anna.

47

## IV.  Conclusion

Mrs. Feingerts lacked the authority to transfer  Feingerts' one-sixth (1/6) of the Bellaire Property to D'Anna.  Feingerts is still a one-sixth (1/6) owner of the Bellaire Property.

Mrs. Feingerts breached the warranty of eviction she owed to D'Anna, and the Sale of the Bellaire  Property from the Trusts and Mrs. Feingerts will be rescinded.  The Succession is liable to D'Anna for:

1.  Purchase price of $127,000, plus interest at the rate contained in the Note or 5.75% per annum from February 29, 2016, until paid;

2.  Accrued mortgage interest on the Note of  $47,466.12 through February 29, 2016;

3.  Closing costs of $12,399.06, interest at the legal rate from closing on July 30, 2009, until paid;

4.  Insurance and property tax payments of $37,810.04, plus interest at the legal rate from date of judgment until paid; and

5.  Improvements of $49,314.93, plus interest at the legal rate from date of judgment until paid.

Fidelity is liable to D'Anna for the Title Policy amount of $261,703.20, after satisfaction of the deductible of  $2,617.03. Fidelity must pay the costs and fees of Seale, Smith, Zuber & Barnette in addition to the Title Policy amount. A separate Judgment will be entered in accord with this Opinion.

New Orleans, Louisiana, March 1, 2016.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

48